LA5GragO

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MICHAEL RAGLAND,

 4                    Plaintiff,

 5              v.                          20 Civ. 3556 (GBD)

 6   CITY OF NEW YORK, et al.,
                                            Oral Argument
 7
                     Defendants.
 8
     ------------------------------x
 9                                          New York, N.Y.
                                            October 5, 2021
10                                          11:00 1

11   Before:

12                    HON. GEORGE B. DANIELS,

13                                          District Judge

14                          APPEARANCES

15   SIM & DEPOLA, LLP
          Attorneys for Plaintiff
16   BY:  SAMEER NATH

17   NEW YORK CITY LAW DEPARTMENT
          Attorneys for Defendants
18   BY:  JOHN E. SCHEMITSCH

19

20

21

22

23

24

25
```

LA5GragO

1          (In open court)

2          THE DEPUTY CLERK:  Case No. 20 Cv. 3556.

3          Will the parties please rise and make their

4     appearance, starting with the plaintiff.

5          MR. NATH:  Sameer Nath from Sim & DePaola for the

6     plaintiff.

7          THE COURT:  Good morning, Mr. Nath.

8          MR. NATH:  Good morning, your Honor.

9          MR. SCHEMITSCH:  Good morning, your Honor.  John

10    Schemitsch on behalf of the City of New York and Officer

11    Wilkens.

12          THE COURT:  Why don't I hear you on your motion.

13          MR. SCHEMITSCH:  Okay, your Honor.  Effectively, we

14    moved for summary judgment on all claims.  Plaintiff didn't

15    respond to a variety of claims, so we're asking that the claims

16    to the extent that they were responded to or substantively

17    responded to that they be dismissed.

18          Just to the address the ones that remain, in the

19    City's purview, it's a false arrest claim, an excessive force

20    claim, a malicious abuse of process claim and a Monell claim.

21          THE COURT:  The ones I want to concentrate on are

22    probably the ones that are dependent on probable cause.

23          MR. SCHEMITSCH:  Understood, your Honor.

24          So to go straight in, the false arrest claim is the

25    main claim in this case.  Plaintiff was in the vicinity of

LA5GragO

Madison Square Garden in the afternoon when officers -- Officer

Wilkens, who is one of the defendants in this case, and Officer

Doogie, his partner, who is a nonparty -- witnessed plaintiff

hailing a cab for a group of individuals.  This was caught on

camera.  They walked over, and Officer Doogie captured on

camera a conversation with one of the passengers in the cab,

which in part was the passenger told Officer Doogie that

plaintiff hailed the cab for him and that plaintiff then,

quote, took five bucks, he said he wanted a tip, and I gave him

$5.

          The officers placed plaintiff under arrest for

fraudulent accosting under New York Penal Law 165.30, which was

accosting an individual with the intent to defraud of money by

means of a trick, swindle or confidence game.  In the City's

purview, this is probable cause, based on representations from

the individual in the cab.  Notably, that the plaintiff

requested payment for doing so, that the officers on camera

appear to have seen plaintiff hail the cab, and that plaintiff

took affirmative steps to get that payment.  Particularly, as

it's in the vicinity of Metro North, Long Island Railroad and

Madison Square Garden, where there are cab stands, official cab

stands.

          THE COURT:  How much is on video?  I was trying to

find the video.  We don't have the video.  You may have to

resend that.  I don't know if the link expired or whether we

LA5GragO

1    initially had it.  But we don't have the video, so I have not

2    had an opportunity to review the video.  And what do you say is

3    on the video?  The hailing the cab and the conversation with

4    the alleged victim, and is there video of the conversation or

5    the arrest of the plaintiff?

6            MR. SCHEMITSCH:  Just to be clear, I apologize for

7    sending it -- I contacted chambers at the time I filed the

8    motion -- they said to email it.  I can resend it in whatever

9    format.

10           The videos, there's actually two videos from each of

11   the officers, both body worn camera footage.  One of the videos

12   shows plaintiff off in the distance and appears as though he's

13   hailing a cab for a group of people.  They get in the cab.  The

14   cab pulls up and then the officers approached more closely to

15   the cab.  It's Officer Doogie's body worn camera footage when

16   he goes up to the passengers of the cab while Officer Wilkens,

17   the defendant, asks plaintiff to step to the side to talk with

18   him.  Officer Doogie asks and confirms with one of the

19   passengers, yes, plaintiff hailed a cab for them.

20           THE COURT:  Is that sound on the video?

21           MR. SCHEMITSCH:  Yes, your Honor.

22           THE COURT:  What was the conversation?

23           MR. SCHEMITSCH:  I believe the extent of that first

24   question is Officer Doogie asking, did he hail a cab for you.

25   The passenger said, yes, he did.  And then the passenger

LA5GragO

1  volunteers, quote, he took five bucks, he said he wanted a tip,

2  and I gave him $5.

3       THE COURT:  If you could get us that video.  How long

4  is the video?

5       MR. SCHEMITSCH:  Both videos are roughly the same

6  length.  I believe they're about 15 to 20 minutes in length.

7  They cover from the start of that interaction through

8  plaintiff's arrest to plaintiff being put in a holding cell at

9  the station house.

10       THE COURT:  How much of the conduct that's on the

11  street is on the video?

12       MR. SCHEMITSCH:  From plaintiff hailing a cab in a

13  distance to the arrest.

14       THE COURT:  Now, hailing the cab in the distance, I

15  assume there's no sound on that?

16       MR. SCHEMITSCH:  That's correct, your Honor.  The body

17  worn camera footage started recording, I believe there's a

18  minute or a minute and a half before the sounds kicks in, as

19  the footage works.

20       THE COURT:  That was the statement, that was pretty

21  much the complete statement from the alleged victim?

22       MR. SCHEMITSCH:  That's right.

23       THE COURT:  What is on the video in terms of the

24  conversation between the police officers and the plaintiff?

25       MR. SCHEMITSCH:  The plaintiff asks the officers why

LA5GragO

1    he's under arrest.  He says, what did I do that was illegal?

2    He admits to hailing a cab.  He says, they gave me a tip.  And

3    that's the extent of that.

4         At one point, a pedestrian walks by and asks the

5    officer for directions somewhere, and the plaintiff says to

6    her, I'm getting arrested for hailing a cab for somebody.

7         THE COURT:  The easiest thing, if you can give me a

8    hard copy would be easiest, a DVD.

9         MR. SCHEMITSCH:  I can, your Honor.

10        THE COURT:  Otherwise, if you are just going to send

11   the link, you can send it.  We will keep looking to see if in

12   fact we received and we still have it, but we have not been

13   able to locate it.

14        MR. SCHEMITSCH:  Understood.

15        THE COURT:  So the question, I guess the real question

16   is, is there -- well, I have two questions.

17        One, it seems to me the first question, is there any

18   factual dispute as to what occurred, and two -- let me take

19   that back, because I don't think that that's the issue.

20        The issue is, is there any factual dispute as to what

21   the police officers knew at the time they made the arrest?  And

22   what is your position as to whether or not the lack of any

23   specific information that the police officers had at the time

24   that the plaintiff initiated the contact with the individuals,

25   what is your position as to how that fits into their possession

LA5GragO

1    of probable cause?

2         MR. SCHEMITSCH:  Well, your Honor, from that

3    perspective, there isn't a dispute of fact as to that.  Counsel

4    may disagree.

5         It's a matter of, you can see from the body worn

6    camera footage that the plaintiff is off in the distance, so

7    they can see the start of that contact.  And moreover, it may

8    come down to a question of, at the very least, qualified

9    immunity, arguable probable cause given the statements offered

10   by one of the victims that plaintiff did hail the cab for them,

11   and he did then take the affirmative step of asking for money.

12        THE COURT:  Is it your position that that information

13   is enough to make an arrest?

14        MR. SCHEMITSCH:  In this circumstance, yes.

15        THE COURT:  Even if the evidence is that the plaintiff

16   did not approach the alleged victims, that they approached him?

17        MR. SCHEMITSCH:  I think, your Honor, given the

18   statements from one of the victims, it would give the officer

19   reason to believe that a crime had been committed, fraudulent

20   accosting.

21        THE COURT:  What about that specific issue?  That's

22   pretty much -- the fraudulent accosting seems to be the essence

23   of the crime.  Which part of that was a fraudulent accosting?

24        MR. SCHEMITSCH:  Your Honor, at the very least, the

25   requesting payment for doing the action.

LA5GragO

1          THE COURT:  So it's your position that I should find

2     that even if the plaintiff did not approach the victims that

3     the asking for the tip after hailing the cab would be

4     sufficient to arrest him?

5          MR. SCHEMITSCH:  Yes, your Honor.

6          THE COURT:  Would it be your position that would be

7     sufficient to convict him?

8          MR. SCHEMITSCH:  It's a different question, your

9     Honor.  And here, we're only addressing probable cause.

10          THE COURT:  I'm trying to understand what distinction

11     you're making.  If an element of the offense is fraudulent

12     accosting and the officer doesn't have any information that the

13     plaintiff accosted the victim, then what would be the basis for

14     the probable cause?

15          MR. SCHEMITSCH:  He did have the information, your

16     Honor.  He had the statement from the victim and his own

17     observation.

18          THE COURT:  Well, what was that evidence?  You haven't

19     articulated that.

20          MR. SCHEMITSCH:  He did see plaintiff off in the

21     distance.

22          THE COURT:  He saw him do what?

23          MR. SCHEMITSCH:  He saw him hailing the cab.

24          THE COURT:  Again, the question really is, for the

25     probable cause, is hailing the cab and receiving a tip enough

LA5GragO

1    to believe that he fraudulently accosted?

2            MR. SCHEMITSCH:  Yes, that's our position, your Honor.

3            THE COURT:  And is there any evidence that the

4    plaintiff took the initiative?

5            MR. SCHEMITSCH:  Just the observations of the officer.

6            THE COURT:  Well, what were the observations of the

7    officers that indicated he took the initiative?

8            MR. SCHEMITSCH:  Just that you can see plaintiff

9    hailing a cab.

10           THE COURT:  Is there any information known to the

11   officer either from the victims or from the plaintiff that

12   indicated that the plaintiff initiated this contact?

13           MR. SCHEMITSCH:  That's all that's in the record, your

14   Honor.

15           THE COURT:  Is that a yes or no?

16           MR. SCHEMITSCH:  Just that plaintiff was seen hailing

17   a cab, that he admitted to hailing a cab.  It's unclear -- and

18   I believe the plaintiff is arguing otherwise -- that he did not

19   affirmatively approach them.

20           THE COURT:  Even that's not dispositive, because the

21   question is whether or not what was the information that the

22   police officer had when he made the arrest and whether that

23   information was sufficient to believe that the plaintiff had

24   committed a crime.

25           MR. SCHEMITSCH:  That's right, your Honor.  You also

LA5GragO

```
1    have to -- it's important to also take into account the
2    location of this.  It was at a corner very near to Madison
3    Square Garden and Metro North, where there are taxicab stands
4    with officials who are hailing cabs as part of their capacity,
5    so that's a consideration too.
6           THE COURT:  So is it your position that the police
7    have probable cause to arrest anybody that they see hailing a
8    cab for someone coming out of Penn Station?
9           MR. SCHEMITSCH:  No, your Honor.  But in this
10   circumstance, they also found out from one of the victims that
11   the plaintiff then did request payment for doing so.
12          THE COURT:  So what did the police officers reasonably
13   believe had just occurred, in terms of facts?
14          MR. SCHEMITSCH:  I believe, based off of the victim's
15   statements, that they believed that plaintiff either approached
16   them or was asked or put himself out there as somebody who
17   could hail a cab for them, hailed a cab for them, and then
18   requested payment for doing so.
19          THE COURT:  What are the facts that would support the
20   conclusion that he approached them or sought to hail a cab for
21   them?
22          MR. SCHEMITSCH:  Well, as I said before, you could see
23   in the video, the plaintiff is off in the distance hailing a
24   cab for them.  And then plaintiff does admit while he's talking
25   to officers that he did hail a cab for them.
```

LA5GragO

1          THE COURT:  Again, I haven't seen the video yet, but

2     does the plaintiff make a representation one way or another at

3     that time as to whether he approached them?

4          MR. SCHEMITSCH:  He does not one way or another.  He

5     does say something to the effect of -- to a passerby who is

6     asking for directions -- I'm being arrested for hailing a cab

7     for somebody.  And he also does admit while he's talking to the

8     officers that they gave him a tip.

9          THE COURT:  But there seem to be three elements to

10     that offense; that's two of those elements.  He hailed the cab,

11     he asked for payment, and the third element is that there was

12     reason to believe that he initiated this contact.

13          MR. SCHEMITSCH:  Yes, your Honor.  And I believe from

14     the statements from the victims, the officers would have had

15     reason to believe that he did initiate the contact.

16          THE COURT:  Again, I'm just not sure what the complete

17     statement from the victims were, other than he asked for

18     payment for hailing the cab.

19          MR. SCHEMITSCH:  He also admitted when he was asked by

20     the officers if he hailed a cab, he said yes, he did.

21          THE COURT:  So the information known to the officers

22     at the time is undisputed evidence that he hailed the cab?

23          MR. SCHEMITSCH:  Yes.

24          THE COURT:  And I'm not sure whether it's disputed or

25     undisputed evidence that he asked for a tip?

LA5GragO

1          MR. SCHEMITSCH:  I believe in the video, it's

2     undisputed at the very least that one of the victims informed

3     the officer of that.

4          THE COURT:  And he responded how with regard to that

5     issue?  He said what about that?  Did he agree that he asked

6     for the tip?

7          MR. SCHEMITSCH:  The victim actually volunteered that.

8     He said, quote -- that the plaintiff, quote, took five bucks,

9     he said he wanted a tip, and I gave him $5.

10         THE COURT:  Did the plaintiff make any statement

11    regarding whether that was in fact true or not?

12         MR. SCHEMITSCH:  The plaintiff was stepped away at

13    that point.  He was with -- this was Officer Doogie having a

14    conversation with one of the victims at the car.

15         THE COURT:  But did he ever make any representation

16    one way or the other to the police officer as to whether or not

17    he sought a tip?

18         MR. SCHEMITSCH:  He admits that he received a tip.

19         THE COURT:  Does he admit that he requested a tip?

20         MR. SCHEMITSCH:  He doesn't say one way or another.

21         THE COURT:  So you're not arguing that there's not a

22    requirement -- to be guilty of this offense, you're not arguing

23    that there is no requirement that the plaintiff initiated the

24    contact, you're just arguing that the circumstantial evidence

25    was sufficient for the officers to believe that he had done so?

LA5GragO

1          MR. SCHEMITSCH:  That's right, your Honor.

2          THE COURT:  Critical to that evaluation, on that

3    evaluation, it seems to me that would be dispositive of the

4    unlawful search and seizure.

5          MR. SCHEMITSCH:  Yes, sir.

6          THE COURT:  And that's Count One and Two, the false

7    arrest, that would be Count Three, the false arrest also and

8    false imprisonment in Count Three and Four, and the assault and

9    battery.

10          MR. SCHEMITSCH:  We also argued in our papers separate

11   grounds for the excessive battery and use of force.

12          THE COURT:  I take those differently.  The assault and

13   battery is different than the excessive force.

14          MR. SCHEMITSCH:  Yes, your Honor.

15          THE COURT:  Now, plaintiff's argument is that laying

16   your hands on me with no good reason is assault and battery.

17   That, in and of itself, doesn't make it excessive force.

18          MR. SCHEMITSCH:  Understood, your Honor.  Yes.

19          THE COURT:  So what is your argument with regard to

20   the assault and battery that's not dependent on the probable

21   cause for the arrest and search?

22          MR. SCHEMITSCH:  Our argument for the assault and

23   battery is the probable cause, but also the argument I

24   mentioned earlier, that officers have a reason to believe --

25          THE COURT:  You are not making a substantive argument

LA5GragO

1    or dispute about what constitutes assault and battery, you're

2    not arguing that even if they illegally arrested him, that you

3    have a separate argument that that arrest wouldn't constitute

4    an assault and battery?

5              MR. SCHEMITSCH:  No, we're not making that argument at

6    this time.

7              THE COURT:  And with regard to the -- that seemed to

8    be most of the primary arguments.  And I can ask Mr. Nath as to

9    whether or not he's pursuing any of those claims after that,

10   but did you want to address specifically any of those other

11   claims, I guess, basically, 6 through 18?

12             MR. SCHEMITSCH:  If you would prefer, your Honor.

13   Otherwise, I'm happy to rest on my papers.  As I mentioned, I

14   do believe that the plaintiff abandons a fair number of claims.

15   From my purview, the only ones that are substantively addressed

16   in the plaintiff's opposition are the false arrest, assault and

17   battery, the excessive force, malicious abuse of process and

18   his Monell claim.

19             THE COURT:  I want to hear from Mr. Nath on those

20   issues and the other issues and focus on the probable cuse.

21   And then if you want to respond to that, you can.

22             Mr. Nath, let's make it simple.  With regard to these

23   claims, let me start with Six.  Six, you claim excessive force?

24             MR. NATH:  Yes, your Honor.

25             THE COURT:  My understanding is that the undisputed

LA5GragO

1    facts are that they put handcuffs on him and he specifically

2    was solicitous of your client as to whether or not those

3    handcuffs were too tight, and he specifically adjusted the

4    handcuffs so they wouldn't be too tight, and he did not use any

5    other illegal force to apprehend your client?

6           MR. NATH:  Yes, your Honor.  Up until the handcuffs

7    were loosened, they were too tight.  They did cause bruising to

8    the plaintiff's wrists.

9           THE COURT:  Did the plaintiff ever say that?

10           MR. NATH:  I believe he did, your Honor.

11           THE COURT:  Did he ever say to the police officer, you

12    put the handcuffs on me too tight and that he was being

13    injured?

14           MR. NATH:  The plaintiff responded to the officer's

15    inquiry whether the cuffs were too tight.

16           THE COURT:  And what was his response?

17           MR. NATH:  The plaintiff's response was they were too

18    tight.  And the officer did admittedly loosen them.

19           THE COURT:  In your position, would that legally

20    constitute excessive force being used by the police officer?

21           MR. NATH:  Your Honor, our position is that up until

22    the handcuffs were loosened, it did constitute excessive force.

23    We do concede that they were loosened upon the plaintiff

24    advising the officer they were too tight.

25           THE COURT:  Is there any evidence that the officer had

LA5GragO

1    reason to believe that the handcuffs were too tight prior to

2    his specific inquiry about those handcuffs and his positive

3    response to your client to loosen the handcuffs?

4            THE WITNESS:  There's nothing on the record to support

5    that, your Honor.

6            THE COURT:  What evidence is there that there was a

7    malicious prosecution?

8            MR. NATH:  Your Honor, our position is that the arrest

9    itself was not supported by probable cause based on the initial

10   contact, that the plaintiff did not initiate any contact with

11   these two people.

12           THE COURT:  But that's not the definition of malicious

13   prosecution.

14           MR. NATH:  So we have a favorable determination, where

15   the district attorney declined to prosecute the matter upon the

16   first court appearance.  The absence of probable cause lends

17   itself to an inference of malice.

18           THE COURT:  Why is that malice?  Under that theory,

19   every time a police officer arrests someone and the DA's office

20   decides they're not going to prosecute it, that's sufficient

21   evidence to convict them of malicious prosecution.  What was

22   malicious about the prosecution?

23           MR. NATH:  Based on the lack of probable cause of all

24   the elements of fraudulent accosting, our position is that the

25   officer made the arrest without any basis to believe that a

LA5GragO

1    prosecution would succeed, which was confirmed by the district

2    attorney's declination to prosecute this matter.

3         THE COURT:  Except that those aren't the elements of

4    malicious prosecution.  I have two questions.

5         One, why does that meet the elements of malicious

6    prosecution?  And two, why haven't you abandoned that argument

7    because those arguments aren't in your papers?

8         MR. NATH:  Speaking to the first issue regarding the

9    elements, I do believe that they have been met.  The initiation

10   or continuation of the prosecution in the absence of probable

11   cause, I believe, has been met, your Honor.  The termination in

12   favor of the accused, I also believe has been met regarding

13   malice, as far as the belief or lack thereof that a prosecution

14   would proceed, but nonetheless was pursued by the officers

15   sending --

16        THE COURT:  Well, what evidence is there in this case

17   that the officer in fact knew that there was no probable cause?

18   I can't put it that way, because probable cause for the arrest

19   tells me nothing about the prosecution.

20        MR. NATH:  Our position as far as -- I'm sorry.

21        THE COURT:  In this case, he was arrested and he

22   wasn't prosecuted.  So what makes this -- I'm not sure I

23   understand -- and if your argument is more than just, if there

24   was no probable cause and he gives the information to the DA,

25   the DA decides, okay, we can't prove this case, then that means

LA5GragO

1  I can sue him for malicious prosecution.

2        MR. NATH:  Your Honor, our position is that the

3  criminal proceedings are initiated upon the officer actually

4  sending the documents to the DA's office, whereupon, a Court

5  appearance is scheduled.  In this case, it was done via DAT.

6  Our position is that is the initiation of the criminal

7  proceedings against the plaintiff, not necessarily the DA's

8  office continuing with that prosecution.

9        THE COURT:  There are four basic, the initiation or

10  continuation of a criminal proceeding, termination of the

11  proceeding in the defendant's favor, lack of probable cause for

12  commencing the proceeding and actual malice as a motivation for

13  defendant's actions.  What evidence is there in this case that

14  there was actual malice for -- having no probable cause is a

15  separate element, lack of probable cause is a separate

16  element -- besides a lack of probable cause, there needs to be

17  some evidence of actual malice.

18        In your complaint, you made some allegations with

19  regard to it being racially motivated by this police officer,

20  but it doesn't appear that discovery has uncovered any evidence

21  of a racial motivation here.  So what is the actual malice?

22  What is the malintent or the ill will that you say is being

23  demonstrated, other than making an arrest based and giving

24  those charges to the DA, and the DA saying, we're not going to

25  prosecute?

LA5GragO

1          I guess I'll look at it more carefully, but I'll

2    accept for the purpose of your argument that this is a

3    favorable termination.  But I'm not even sure that this

4    constitutes a favorable termination.  This is not an acquittal

5    of the defendant.  It's a declination.  So I'm not sure that --

6    what part of the prosecution you say was initiated that was

7    later declined?

8          It seems to me they arrested him, they gave the

9    information.  In most cases, you're talking about a case where

10   the officer is -- particularly with the abuse of process -- an

11   officer has fabricated evidence, there's at least some

12   indication that they're taking inappropriate action for

13   illegitimate reason.  I don't see any of the argument from you

14   or any reference to any facts that you say you will present at

15   trial that would indicate that there was some ill motive or

16   additional motive or separate motive for arresting your client

17   other than that they say they thought he committed.

18          MR. NATH:  In the plaintiff's 50H testimony, I think

19   it's on Page 14, he did testify that the officer informed him

20   that they were under some directive to quote, unquote, clean up

21   the streets in that area.

22          THE COURT:  Why is that a bad motive?  Why is that an

23   ill motive, to clean up the streets?

24          MR. NATH:  Our position is a person should be arrested

25   if they're committing a crime, not just because the officer is

LA5GragO

1    under pressure from their supervisors.

2        THE COURT:  The officer didn't say, I was told to go

3    out and arrest innocent people.  That's not the nature of the

4    statement.  If I'm Eliot Ness and say I'm going to clean up

5    Chicago, every time I arrest somebody, that's not evidence of

6    my ill will or bad motive, other than I'm supposed to arrest

7    the bad guys and supposed to arrest people who commit crimes.

8    I'm not sure you can rely on that as an admission by the police

9    officer that he intended to arrest innocent people.

10       Those are my concerns about those claims.  You also

11   have -- and you can discuss it further, if you think it's

12   appropriate to continue to pursue those additional claims -- as

13   I said, the abuse of process seems to be a requirement that

14   there be some other evidence of some other illegitimate reason

15   why they were prosecuted.  And I'm trying to understand at what

16   point you're separating the arrest from the prosecution.  And

17   the arrest itself has its own requirements.  But the

18   prosecution here, you're not talking about -- I mean, he never

19   went to court, so the prosecution has to be somewhere after he

20   was arrested up until it was presented to the DA.

21       MR. NATH:  I believe he did go to court, but he was

22   told at court that he didn't have to appear, that the

23   prosecution was declining.  I would submit that goes to

24   damages, he had to take his time out of his life to go to

25   court.

LA5GragO

|  |  |
|--|--|
| 1 | THE COURT:  I'm not sure under those circumstances |
| 2 | where you have a claim for -- and you don't really argue in the |
| 3 | papers -- you have a claim for a denial to a right for fair |
| 4 | trial. |
| 5 | MR. NATH:  We don't argue that in our papers because |
| 6 | it basically terminated after his first court appearance. |
| 7 | THE COURT:  Obviously, your client did not want a |
| 8 | trial. |
| 9 | MR. NATH:  He did not. |
| 10 | THE COURT:  He preferred to not have to walk into the |
| 11 | courtroom.  I'm not sure anybody denied him a fair trial. |
| 12 | And two other things -- rather three things -- I'm not |
| 13 | sure there's any evidence that there was a denial of equal |
| 14 | protection.  Is there some evidence in this case of that? |
| 15 | MR. NATH:  At this time, there is no such evidence. |
| 16 | THE COURT:  And I'm not sure I understood your failure |
| 17 | to intervene.  You claimed that Officer -- you have a direct |
| 18 | substantive claim against the officer who made the arrest, |
| 19 | Officer Wilkens? |
| 20 | MR. NATH:  Yes, your Honor. |
| 21 | THE COURT:  Who failed to intervene? |
| 22 | MR. NATH:  Officer Doogie. |
| 23 | THE COURT:  Officer Doogie? |
| 24 | MR. NATH:  Yes, your Honor. |
| 25 | THE COURT:  So because I don't have Officer Doogie |

LA5GragO

1    named as a defendant --

2            MR. NATH:  We don't have him named as a defendant.

3    Yes, your Honor.

4            THE COURT:  You claim he should have done what?

5            MR. NATH:  He should have intervened to prevent the

6    false arrest based on the lack of any knowledge, lack of any

7    indication that my client had initiated the contact with the --

8    we've been referring to them as victims, and I don't even like

9    to refer to them as that.

10           THE COURT:  The problem is I don't know what role he

11   played in this, where he was when any of these conversations

12   were going on, what he knew.  I'm not quite sure what you say

13   that you have established as to Officer Doogie that would put

14   him in a position to know that the arrest that Officer Wilkens

15   was making based on Officer Wilkens' observation was a false

16   arrest.

17           MR. NATH:  At this time, I don't have any testimony

18   from Officer Doogie.  That being said --

19           THE COURT:  Do you have any testimony from any witness

20   that places Officer Doogie even in relationship to these

21   conversations that are going on?  What is it that you're basing

22   your knowledge that Officer Doogie had that would have or

23   should have been enough knowledge to know that Officer Wilkens

24   was making a false arrest?

25           MR. NATH:  All I have to establish Officer Doogie's

LA5GragO

1   presence near the seen is the body worn camera footage.

2           THE COURT:  Again, I haven't had a chance to look at

3   that yet.  Whose body camera, is that Officer Wilkens or

4   Officer Doogie's body camera?

5           MR. NATH:  I don't want to misquote.  I believe that

6   Wilkens' camera -- and counsel is free to correct me if I'm

7   wrong about this, I am just going off the top of my head -- I

8   believe Officer Doogie is the one who approached the persons

9   who were in the taxicab already.  And I believe Officer Wilkens

10  was the one who initially observed my client hailing a taxicab.

11          THE COURT:  What do you say Officer Doogie knew that

12  should have made him stop this arrest?

13          MR. NATH:  At some point, I'm sure they spoke with

14  each other regarding what the complaining witness or what these

15  people stated.

16          THE COURT:  I can't say I'm sure he did that, unless

17  you can say --

18          MR. NATH:  I don't have any evidence.

19          THE COURT:  -- that you're going to present to the

20  jury that he did this.  You know better than I.  I don't know

21  if they were on foot, how far away they were, I don't know if

22  Officer Doogie saw the same thing Officer Wilkens saw.  I don't

23  know if Officer Wilkens based his arrest on information that

24  was exclusive to him as opposed to Officer Doogie.  And like I

25  said, since Officer Doogie isn't a named defendant here, I'm

LA5GragO

not sure what it is that you say the evidence demonstrates that would put Officer Doogie in a situation where he could have and should have stopped this arrest.

MR. NATH: Your Honor, at this time, I would agree that the evidence does not support that, because of the lack of evidence, not because the evidence says something contrary. And I would request that this claim not be denied on grounds of prematurity.

THE COURT: Well, I'm not sure it's premature. I men, your Rule 56 statement should give me some indication that you have discovered evidence during discovery that would be sufficient to convince a jury that Officer Doogie did the wrong thing. I don't know what evidence you say that you have uncovered to the support a claim that Officer Doogie stood around and let Officer Wilkens commit a false arrest, that he was in a position to know that and in a position to prevent it. It's a little late in the proceeding to just sort of tag along Officer Doogie and say, we'll see if we can figure something out at trial to say that he did and knew when he is not even named as a defendant. And it wouldn't be appropriate to substitute him as a defendant unless you had such evidence at this point.

MR. NATH: Yes, your Honor.

THE COURT: To support that he was a John Doe defendant who was in a position to prevent Officer Wilkens from

LA5GragO

1    making this arrest.

2           The last thing -- and then we'll talk about the

3    probable cause -- the last thing is the Monell claim.

4    Basically, my understanding is that your argument is that it is

5    simply sufficient that someone told, someone superior to the

6    officers on the scene told Officer Wilkens and/or Officer

7    Doogie to go ahead and make the arrest.

8           MR. NATH:  The only support that we do have for that

9    Monell claim is that statement from the 50H where the inspector

10   had told them to clean up the streets.  Beyond that, there's

11   nothing else in the record that supports --

12          THE COURT:  Again, that's a statement in general, that

13   wasn't a statement in relationship to this arrest?

14          MR. NATH:  That was a statement made --

15          THE COURT:  Prior to this arrest?

16          MR. NATH:  That was a statement made, I believe, in

17   the police car, when they were transporting plaintiff.

18          THE COURT:  Then I'm not sure what you say that

19   direction was.  They've already made an arrest.

20          MR. NATH:  Yes, your Honor.

21          THE COURT:  And you say that reflects a practice on

22   behalf of higher ups to do what?

23          MR. NATH:  That they are encouraging their officers to

24   make these arrests, putting pressure on their officers to make

25   these arrests.

LA5GragO

1              THE COURT:  What are these arrests?

2              MR. NATH:  Arrests in that vicinity.

3              THE COURT:  But there's nothing wrong with that.

4    That's not an illegal thing, to make arrests, make appropriate

5    arrests in and and around Penn Station.  That may have been

6    what they are encouraged to do or even directed to do, but what

7    you have to demonstrate is that they gave them some direction

8    that reflects a policy or practice to illegally arrest people,

9    to arrest people who did nothing wrong.

10             What is it about that statement that would reflect an

11   intent of the police department or any supervisory personnel

12   that they're telling the police officer, go out and make false

13   arrests?

14             MR. NATH:  I would not represent that that statement

15   by itself evinces an instruction by superiors that they are to

16   go out and make false arrests.

17             THE COURT:  So ultimately -- and the most important

18   thing is -- the question of was there probable cause for this

19   arrest.

20             MR. NATH:  Your Honor, that's the central tenet of how

21   I view this case.

22             THE COURT:  And you say that there was no probable

23   cause for this arrest, because Wilkens knew at the time that he

24   had no information that your client had initiated this contact?

25             MR. NATH:  Yes, your Honor.

LA5GragO

```
 1              THE COURT:  And that seems to be the essence of the
 2    issue?
 3              MR. NATH:  Yes, your Honor.
 4              THE COURT:  There's no direct evidence that your
 5    client initiated the contact?
 6              MR. NATH:  Yes, your Honor.
 7              THE COURT:  The officers didn't see that, your client
 8    didn't tell the officer that, and the victim didn't make any
 9    statement with regard to that?
10              MR. NATH:  That is correct, your Honor.
11              Can I speak to the substantial evidence?
12              THE COURT:  Yes, that's what I was leading right up
13    to.  So they argue that the circumstantial evidence made it
14    reasonable for the officer to believe that that's what had just
15    occurred.  You say no.
16              MR. NATH:  Your Honor, I disagree with that.  I mean,
17    there's plenty of people around Madison Square Garden.  We are
18    all New Yorkers, we all know.  There's a bunch of tourists
19    around there who don't know where they're going.  They do ask
20    for directions.  This is a thing that happens, that people ask
21    other people for directions.  I mean, there were two -- I
22    believe they were a little older, my client assisted them,
23    carrying their luggage.  I believe they hailed two taxis, not
24    just one, because they had a lot of luggage.
25              THE COURT:  Well, I don't understand what it is that
```

LA5GragO

1  your client claims happened.  Why is he engaged with these

2  people to this extent?

3          MR. NATH:  My client was in the area waiting for his

4  brother.  There's a bunch of restaurants around there.  He was

5  waiting for his brother.  I believe it was one of the two

6  individuals who he ended up calling the taxi for who approached

7  him, asking where they could find a train.

8          THE COURT:  And that would be his testimony at a

9  trial?

10          MR. NATH:  Yes, your Honor.

11          THE COURT:  Go ahead.

12          MR. NATH:  He saw all the bags that they had and told

13  them that taking the train may not be the best idea, just given

14  all their luggage.  They agreed him.  They asked him to call

15  them a taxi.

16          THE COURT:  I'm not sure I understand what that means.

17  Why would they ask him to call them a taxi?

18          MR. NATH:  I don't know why they would ask him.

19          THE COURT:  Why does that make sense?

20          MR. NATH:  I'm sorry, I actually -- I misstated that.

21  He told them that a taxi was probably a better idea.  They

22  agreed with him.  They didn't ask him to call them a taxi.

23          THE COURT:  That's my recollection from reading the

24  papers, okay.  So he -- you got all this luggage, you're better

25  off taking a taxi.  So how did that go to the next step of him

LA5GragO

1    being engaged further with that?

2         MR. NATH:  I don't understand the question, your

3    Honor.

4         THE COURT:  Well, he says, you ought to take a taxi

5    instead.  He could have walked away at that point or he could

6    have further helped them.  How did it end up that he's still

7    involved with them to the extent that he's going to get paid

8    for it, as opposed to, okay, I told them to take a taxi,

9    they're capable of calling a cab on their own, they don't need

10   me for that; how does that turn into now he's working for them

11   and expecting payment?

12        MR. NATH:  Well, first of all, I don't think he was

13   expecting payment, because his statement is that they tipped

14   him and he didn't ask for it.  I understand that does not bear

15   on probable cause because that's what the officers knew.

16        THE COURT:  Well, the officer, at that point, he

17   testified that he, your client -- he was told by the victims

18   that your client asked for payment.

19        MR. NATH:  Right.  So I'm not disputing what the

20   officers knew at that time.  I'm disputing what actually

21   happened, but that does not bear on probable cause for the

22   officer.  I'm just trying to paint the picture of what went

23   down.

24        THE COURT:  That's reasonable.

25        MR. NATH:  There's nothing in the record that actually

LA5GragO

1    connects the two -- those two parts of the sequential chain,

2    meaning how he goes from just speaking to them to calling a

3    taxi.  But the natural reading of the testimony is he was just

4    being friendly with them and assisting them, not anything

5    nefarious beyond that.

6         THE COURT:  That's the thing, that's one of the

7    reasons I want to see the video.  I'm trying to understand how

8    your client presented himself to them.  I don't know whether

9    your client is dressed in a suit and tie, I don't know whether

10   your client had a hundred dollars worth of dollar bills in his

11   pockets that are consistent with him having stood on the street

12   and done this for the last six hours or he just had been

13   standing there for five minutes waiting for his brother to get

14   off the train.  You say they were going to a restaurant.  I

15   don't know whether he had any money to buy any food.

16        In examining what both of you argue is circumstantial

17   evidence of a credible issue with regard to probable cause;

18   some of those things may make or may not make a difference.

19   And I guess it still brings me to the analysis that is there --

20   to arrest someone for a crime, should the officer reasonably

21   believe that your client was the one that initiated this

22   contact, your client was the one that accosted these

23   individuals in order to make them think that they were under

24   some legal or moral obligation to give him money, and if that

25   is a requirement.  If that's not required, then they had

LA5GragO

1    probable cause.

2          If it is required, then the question is, without any

3    direct evidence, would these circumstances give a jury a

4    reasonable basis to conclude that the officer has a legitimate

5    defense.  And his legitimate defense would be, look, I'm out

6    there, we're doing enforcement around train stations and

7    airports.  There are people who -- tourists who are being

8    ripped off, because they're being accosted by people who are

9    trying to make them think that they have some obligation to pay

10    them money because these people are here assisting them and

11    that they're doing this in the expectation of payment.  And in

12    this case, your client disputes the statement by the victim

13    that your client asked for money.

14          MR. NATH:  Yes.  But I concede that that doesn't go to

15    probable cause.

16          THE COURT:  I'm not sure yet because I still have to

17    judge whether or not, under the circumstances, who is telling

18    the truth on that issue.  Is your client telling the truth when

19    he says he didn't ask for money?  Is the cop telling the truth

20    that he says that the victims told them that he asked for

21    money?  Or is the victim telling the truth when they told the

22    cop that your client asked for money and should the cop maybe

23    have any basis to believe or not to believe that?

24          I assume that last issue is going to be more resolved

25    in the cops' favor.  The cops get on the stand, that's what

LA5GragO

1    they told me, I specifically asked them that, and there's no

2    doubt in my mind that the victims told me that it was plaintiff

3    who asked for money, that they didn't just simply say, hey,

4    let's just take out our wallet and do you want money and give

5    him money.

6            Does that make more sense?  Who is going to sound more

7    credible at a trial?

8            Again, that doesn't go to probable cause.  But if your

9    client is going to get on the stand and say, no, I didn't ask

10   them for any money, is that something a jury is going to

11   believe?  Or if the officer gets on the stand and says, they

12   told me they asked for money.

13           But again, you hit the nail on the head, that's not

14   the dispositive issue.  It seems to me the dispositive issue is

15   whether or not the officer was in a position to believe that

16   plaintiff was committing a crime.  And at this point, the only

17   crime here that is applicable, possibly applicable in this case

18   is fraudulent accosting.  So the question is whether or not the

19   officer believed he was committing fraudulent accosting,

20   reasonably believed that, and therefore, had a basis --

21   regardless of whether the D A's office was going to prosecute

22   them or whether or not they were even going to arraign the

23   case -- whether or not he had a reasonable basis to arrest him.

24   And arrests have more purposes than just prosecution.

25           As you say, go out there and clean it up.  I see a guy

LA5GragO

who I think is accosting passerbys, I'm going to arrest him.

I'm not going to sit there and analyze how strong my case is.

That's not my job.  My job is to do the arrest.  It's the job

of the DA's office to figure out which ones they're going to

prosecute.  As long as I don't give any false information to

the DA's office in support of that prosecution -- that would be

abuse of process, malicious prosecution.

So what is it?  Is there anything that I should look

to that you say is determinative of the issue of whether or not

this officer had probable cause at the time?

MR. SCHEMITSCH:  Nothing, your Honor, beyond what I

have already addressed.

THE COURT:  Anything?

MR. NATH:  Nothing beyond what we addressed.

I just -- it's really the defense's motion.  I believe

they haven't carried their burden to demonstrate that there are

no questions of material fact as to all of the elements,

meaning the first element, meaning the accosting element of the

offense.  Beyond that, I have nothing else to add, your Honor.

THE COURT:  So let me look at the video.

MR. SCHEMITSCH:  Yes, your Honor.  I'll contact

chambers to facilitate that.

THE COURT:  That I think may or may not advance that

issue.  But it would give me a context and circumstantial

evidence that you both are attempting to rely on.  And then as

1    soon as I get that, I'll evaluate each one of these claims and

2    what is supported by the evidence or the arguments in

3    furtherance of these claims.

4              MR. SCHEMITSCH:  Your Honor, we just have one other

5    issue.

6              THE COURT:  Yes.

7              MR. SCHEMITSCH:  So at the last hearing we had back in

8    June, we were seeking to move early, before the depositions, to

9    save additional resources.  You directed that depositions, if

10   any, would take place in August, but we would have at the last

11   conference -- there was going to be an oral argument date in

12   the beginning of August -- you were going to decide based off

13   of plaintiff's request if depositions were going to happen or

14   not.

15             THE COURT:  Whose depositions haven't been taken?

16             MR. SCHEMITSCH:  No parties, no nonparties, no

17   depositions were taken.

18             So at this point, we would be asking, should any

19   claims remain from defense counsel's perspective, we would be

20   asking for a brief -- maybe 30 days -- so we can discuss

21   settlement at that point.  And then after that --

22             THE COURT:  What depositions do you want to take?

23             MR. SCHEMITSCH:  Should any claims remain, we would

24   want plaintiff's.

25             THE COURT:  And what depositions would you want?

LA5GragO

1          MR. SCHEMITSCH:  We would want Officer Wilkens and

2     Officer Doogie.

3          THE COURT:  And how do you suggest that I proceed, in

4     light of the fact that at this point I don't even have

5     testimony from them and it may -- it appears to me, that how

6     they're going to stand up as witnesses and what they're going

7     to say may be significant to this motion.

8          MR. SCHEMITSCH:  Well, we do have plaintiff's 50H

9     testimony.

10         THE COURT:  You do have that testimony?

11         MR. SCHEMITSCH:  Yes.  So we would be asking that

12    following your decision on the motion, should any claims

13    remain, from defense's perspective, we would be asking for 30

14    days, just so if anything remains, we can discuss settlement

15    with counsel.  And then another 30 days past that to finish any

16    depositions.

17         THE COURT:  I don't have any problems with that.  The

18    only awkwardness is to make the depositions -- whether it's

19    appropriate to make the depositions dependent on the decision,

20    as opposed to the other way around.

21         Do you have any position one way or the other,

22    Mr. Nath?

23         MR. NATH:  When I was speaking earlier about denying

24    their motions on prematurity grounds, I was alluding to the

25    fact that depositions hadn't been heard.

LA5GragO

1        MR. SCHEMITSCH:  At that hearing, you did specifically

2   address to plaintiff's counsel, they should address that -- if

3   they believe our motion was premature and they needed

4   depositions -- in their responsive papers, which they didn't.

5        THE COURT:  The answer is I think your motion is

6   probative, in terms of doing the depositions and engage in

7   settlement if I don't dismiss the case.  It seems to me that

8   the way it's been argued, that it's appropriate for me to

9   proceed on the representations that the parties have made about

10  what witnesses are going to say and to the extent that you

11  argued that certain things are in dispute.  And we do have at

12  least an under oath statement by the plaintiff.  And at this

13  point, I will have no reason to believe that the police officer

14  is going to say anything more or less than what the two of you

15  have represented.  So I think that doesn't significantly affect

16  the issue with regard to probable cause, accepting all of the

17  facts as true that you have represented.

18        I think the real issue still is whether or not --

19  assuming that this is what the testimony is going to be --

20  whether or not that would be sufficient for the officers'

21  probable cause, particularly in this case, since Mr. Nath has

22  acknowledged that the real question is what did the police

23  officers know, what information did he have at the time.  And

24  you're not really disputing significantly what the police

25  officer had in terms of knowledge.  The question is whether or

LA5GragO

1   not that is sufficient for probable cause, given the nature of

2   the arrest.

3          So give me 30 to 60 days to resolve this.  And then

4   what I'll do is -- why don't a schedule a conference in

5   January.  By that time, hopefully, we can resolve the motion.

6   If you're going to engage in further settlement discussions,

7   either before or after that, if the motion is not granted in

8   full, and you can take the time to do that.

9          If claims still remain and you aren't able to settle,

10  then we can talk about what else you need to do, in terms of

11  finalizing discovery with regard to depositions, and we can

12  talk about setting a trial date.

13         So let's schedule a conference for January 18th at

14  10:30.  And we'll see at that time.  This has been helpful.

15  Thank you very much.  I'll get back to you as quickly as I can.

16         (Adjourned)

17

18

19

20

21

22

23

24

25